## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JASON THOMPSON                                    CIVIL ACTION

VERSUS                                            NO.  10-0129

N. BURL CAIN                                      SECTION "S"(2)


## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.     STATE COURT PROCEDURAL BACKGROUND

The petitioner, Jason Thompson, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  Thompson and a co-defendant, Chris T. Jacobs, were charged by bill of information in Orleans Parish on March 21, 2002, with the armed robbery and second degree kidnapping of G.L.[3] and the armed robbery of Anastasia Jones.[4]  The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case in relevant part as follows:

> At trial, Anastasia Jones testified that she had just returned home from work, and her mother had dropped her child off, when Thompson knocked on her door and asked if he could speak with her.  Reluctantly, Ms. Jones allowed him to enter, but she left the door open.  Ms. Jones' boyfriend, Johnny White, and her infant child were in the bedroom at the time.  Thompson then asked to use the restroom, and Ms. Jones allowed him to do so. . . .
>
> Ms. Jones further testified that after Thompson came out of the restroom, he withdrew a handgun from his waistband.  She described the weapon as a small gun, which was not a revolver.  She testified that she knew this because it did not have a little round piece in the middle.  The two were in the living room at this time.  Thompson called out to an accomplice waiting outside the still open door to the apartment and said "Yo C, bra, come here."  This second subject who entered the apartment had a shirt tied around his face covering his nose and mouth, and a black skullcap over his head.  Ms. Jones testified that she had never seen this individual before.
>
> Ms. Jones also testified that Thompson ordered her into the bedroom where Johnny White and her child still remained.  Thompson ordered Johnny White to disrobe, and then he took Ms. Jones' state identification and all the money that she and Mr. White had, and then exited the room.
>
> She testified that Thompson reentered the bedroom with the subject "C" and told Ms. Jones, "I got your I.D.  If you go to the police we know where you stay and

---

[2]Rec. Doc. No. 3.

[3]Because G.L. was age 17 at the age of trial, I will use initials rather than the full name of the juvenile victim.  St. Rec. Vol. 8 of 13, Trial Transcript, pp. 267-68, 6/18/02 (G.L.).

[4]St. Rec. Vol. 2 of 13, Bill of Information, 3/21/02.

we know what you look like, we going to get you."  Thompson handed the ID to "C."
. . .

Ms. Jones testified that she reported the crime at the Fourth District Police Station.  Initially she spoke with Detective Troy Williams, and subsequently she met with Detective Calico.  She informed the police that she knew the perpetrator and gave them his name.  She testified that he was wearing a gray pullover, black jeans and black "G Nikes."  Subsequently, Detective Duzac presented Ms. Jones with a photo array, and she positively identified Jason Thompson.

[K.G.][5] testified at trial that at approximately 9:00 p.m. on the same evening, three high school students, [D.D.],[6] [K.G.], and [G.L.], had finished watching the Cleopatra parade on General DeGaulle Avenue.  They had returned to [G.L.]'s automobile, a late model Honda Accord that was parked in a field adjacent to a Winn Dixie.  As the three stood by the car, two men appeared seemingly out of nowhere.  Initially, the strangers engaged the three in some small talk.  As [G.L.] moved towards the driver door and entered the car, one subject followed.  Standing by the open door, the subject pulled out a gun and cocked it.  When [D.D.] heard the sound, she ran.  As she ran off, she told [K.G.] to run also.  [D.D.] testified that she did not see either suspect's face. . . .

Two days after the robbery, [K.G.] was shown a photo-lineup of Jason Thompson, and she was unable to make a positive identification.  She testified that she was not one-hundred percent sure of the identification, and did not want to pick the wrong person, so she did not pick anyone.  [K.G.] also suggested that she believed Jason Thompson was one of the perpetrators because his face looked familiar.  Forty-one days after the robbery, [K.G.] made a positive identification of Chris Jacobs.

[G.L.] testified that when he heard Thompson tell him to move over he did not believe him until he cocked the gun.  After [G.L.] moved over to the passenger seat, the subject sat in the driver's seat.  He then had [G.L.] start the car.  As Thompson drove the car, he kept the gun behind the headrest pointed at [G.L.]'s head.  Thompson wanted [G.L.]'s wallet, cell phone, and any drugs that he had.  [G.L.] gave him his wallet and told him that he did not have a cell phone, believing that one of the girls had it, or any drugs.  As they drove, [G.L.]'s cell phone rang, and [G.L.] answered the phone.  Thompson grabbed the phone and threw it down.

[G.L.] further testified that Thompson told the victim that he had done this before and that he had robbed someone earlier that night.  Thompson told [G.L.] to remove his clothes, and he complied.  As they drove, Thompson told [G.L.] to look him in the face, and Thompson kept asking him if he had seen him before or if he

---

[5]Because K.G. was age 15 at the time of trial, I will use her initials rather than the full name of this juvenile witness.  St. Rec. Vol. 8 of 13, Trial Transcript, p. 224, 6/18/02 (K.G.).

[6]Because D.D. was age 15 at the time of trial, I will use her initials rather than the full name of this juvenile witness.  St. Rec. Vol. 8 of 13, Trial Transcript, p. 207, 6/18/02 (D.D.).

knew him.  In all, [G.L.] recalled being in the car with Thompson for approximately fifteen to twenty minutes.

Finally, Thompson told [G.L.] to lift his arm over his head, and then Thompson put the gun to [G.L.]'s side and said, "I really hate to do this."  [G.L.] believed that Thompson was going to shoot him.  At that moment, the car hit a curb and blew a tire.  They drove for a while on the flat tire before pulling into a Texaco Station.  Thompson told [G.L.] to get out, and he stood behind an air pump.  A police car drove up at this point.  [G.L.] recalled that the policeman said something, and that the subject then ran off with [G.L.]'s jeans and two shirts, and that the policeman chased after him.

[G.L.], [K.G.] and [D.D.] each testified that Thompson wore a white headband with the logo, "RIP DOGG" written across the front.  [G.L.] testified that he wore gloves.  [G.L.] testified that the gun was a small automatic.  [G.L.] identified Thompson from a photographic lineup twp days after the robbery.

Officer Jeffrey Reyes testified that on the night in question he and his partner received a call of a carjacking involving an older model white Toyota with a white male as the victim and a black male as the perpetrator.  As Officer Reyes and his partner approached the Texaco station, he observed a white male was completely naked, and they stopped to investigate.  Officer Reyes asked [G.L.] what he was doing and what happened to his clothes.  [G.L.] looked shaken and disturbed so Officer Reyes immediately exited the car.  When Officer Reyes got out of the vehicle, [G.L.] pointed to the vehicle and gestured with his head that something was definitely wrong.  At that point a black male subject exited the vehicle.  Officer Reyes called over to him, and he turned to look at the officer.  The subject turned towards the Texaco station and acted as if he were calling to someone.  Officer Reyes told the subject to approach, and the subject broke out into a sprint.  Officer Reyes chased the subject through some woods near the Woodlands Apartments, but was unable to apprehend him.

Sergeant Jerome Laviolette testified that he participated in the investigation of the armed robbery on the evening of January 25.  He recovered the victim's clothes in the area behind the Woodlands Apartments.  Sergeant Laviolette requested that [G.L.] not terminate the service on his cell phone so that they could investigate whether the phone was used after the incident.  The cell phone records were subpoenaed and introduced at trial.  Sergeant Laviolette's investigation revealed that a call was placed after the incident to Thompson's father.  His investigation further revealed information indicating that a call was placed to Christopher Jacob's cell phone.

Sergeant Laviolette also testified that a search warrant was executed for Thompson's apartment in the Woodlands Apartments complex on January 28, 2003, where he was arrested.  Also present were Thompson's fiancee, Quintella Jones, and their three children.  The police recovered a white headband with the inscription "RIP DOGG," a Louisiana state ID in the name of Anastasia Jones, a .22 caliber semi-automatic pistol, a Nintendo 64, a black hat or skull cap, and a pair of blue jeans.

4

Dana Caldwell testified on Thompson's behalf.  She testified that she recalled the day of the robberies, January 25, 2002, as it was her graduation day from Bryman College.  She testified that she had been with Thompson from 2:00 in the afternoon up until 8:00 that evening when she left for her graduation ceremony.  She further testified that they were at her cousin, Nicole Caldwell's, apartment in the Woodlands Apartments, and that Kendall Griffin, her boyfriend, Dale Anderson, Nicole Caldwell, and Michelle Hammoth, her teacher, were also present.

Dale Anderson testified that she recalled that date in question, as it was his cousin, Dana Caldwell's, graduation and that he was present at Ms. Caldwell's cousin's apartment.  He testified that there was something of a get together and that Thompson was present from 2:00 in the afternoon until 8:30 p.m., when they were picked up by Mr. Anderson's cousin, Leon.  Kendal Griffin was also with them. The went to Kenner.  After cashing paychecks in Kenner, they proceeded to UNO where the graduation was being held.  Mr. Anderson testified that he remained in the car with Thompson while Mr. Caldwell went inside.  The ceremony had already concluded by this time, and they returned to Nicole Caldwell's apartment.  He estimated that they arrived back at the apartment approximately 10:30 pm.  He testified that Thompson went home at approximately 1:00 a.m.

Kendall Griffin also testified that he was with Thompson and the other on the day in question.  His testimony was consistent with that of Mr. Anderson and Ms. Caldwell.

Nicole Caldwell testified in accordance with the previous defense witnesses. She related that Thompson was at her apartment on the day in question.  She left at approximately 8:00 p.m. to attend the graduation and returned sometime later.  She testified that she regarded Thompson as a close friend and that they were intimate at that time.

Jason Thompson testified on his own behalf.  He testified in accordance with the other alibi witnesses as to his whereabouts on the night in question.  He also testified that he had known Anastasia Jones for approximately two months, and that she had pursued a relationship with him.  He related that on the evening he was arrested at her apartment, she had called him while he was at the apartment of two male friends in the same complex, and asked him to come over.  He testified that he was there five minutes when the police arrived and arrested him.  He testified that the judge gave him six months probation.  Thompson also related a previous incident when he was at Jones' apartment when another male, who he believed was a former boyfriend, came over and then left.

Thompson also testified that he purchased the Nintendo approximately one year before the police confiscated it.  He testified that he had mistakenly picked up Anastasia Jones' ID card thinking it was his own approximately two weeks earlier when he had been at her apartment.  He testified that the gun belonged to his fiancee, who lived with him.  Thompson admitted previous convictions for possession of cocaine and possession of marijuana.

(footnotes added) <u>State v. Thompson</u>, 855 So.2d 442 (La. App. 4th Cir. 2003) (Table); State Record Volume 10 of 13, Louisiana Fourth Circuit Opinion, 2003-KA-0599, pages 2-9, September 24, 2003.

Thompson and Jacobs were jointly tried before a jury on June 17 through 20, 2002.[7]  Thompson was found guilty as charged on each of the three counts.  Jacobs was found not guilty on each count.  The state trial court later denied Thompson's motions for new trial and for post-verdict judgment of acquittal.[8]

After finding that Thompson was a second felony offender, the state trial court sentenced him on November 22, 2002, to serve 50 years in prison as a multiple offender for the armed robbery of G.L. without benefit of parole, probation or suspension of sentence and with an additional five years in prison consecutive to that sentence as a firearm enhancement.[9]  The court sentenced him to serve a concurrent 25 years in prison for the second degree kidnapping of G.L., with the first two years to be served without benefit of parole, probation or suspension of sentence.  The court also sentenced him to

---

[7]St. Rec. Vol. 1of 13, Trial Minutes, 6/17/02; Trial Minutes, 6/18/02; Trial Minutes, 6/19/02; Trial Minutes, 6/20/02; St. Rec. Vol. 4 of 13, Trial Transcript, 6/17/02; Trial Transcript, 6/19/02; St. Rec. Vol. 8 of 13, Trial Transcript, 6/18/02; St. Rec. Vol. 10 of 13, Trial Transcript, 6/20/02.

[8]St. Rec. Vol. 1 of 13, Hearing Minutes, 11/8/02; St. Rec. Vol. 3 of 13, Motion for New Trial, 9/6/02; Motion for Post-Verdict Judgment of Acquittal, 9/6/02.

[9]St. Rec. Vol. 1 of 13, Sentencing Minutes, 11/22/02; St. Rec. Vol. 2 of 13, Multiple Bill (undated); St. Rec. Vol. 10 of 13, Sentencing Transcript, 11/22/02; St. Rec. Vol. 3 of 13, Notice of Objection to Multiple Bill, 9/6/02; Defendants Objection and Opposition to Multiple Bill of Information, 10/11/02; Notice of Objections to Multiple Bill, 11/22/02.

serve a concurrent 50 years in prison for the armed robbery of Jones, to be served without benefit of parole, probation or suspension of sentence.  The court further denied his motion to reconsider the sentences.[10]

On direct appeal, Thompson's counsel raised four assignments of error:[11] (1) The evidence was insufficient to support the verdicts. (2) The state trial court erred in denying the motion for new trial. (3) The state trial court erred in denying the motion for post-verdict judgment of acquittal. (4) The state trial court erred in allowing evidence of the municipal conviction to be admitted during the state's case in chief.[12]  On September 24, 2003, the Louisiana Fourth Circuit affirmed Thompson's convictions, finding no merit in his claims.[13]  The court also vacated the five year consecutive sentence for the firearm violation because it was to be imposed as an enhancement not as a separate sentence. The remaining sentences were affirmed.

On February 13, 2004, the Louisiana Supreme Court denied without stated reasons the related writ application filed by counsel.[14]  Thompson's conviction became final 90

---

[10]Id.; St. Rec. Vol. 5 of 13, Motion to Reconsider Sentence, 11/22/02.

[11]St. Rec. Vol. 10 of 13, Appeal Brief, 2003-KA-0599, 5/28/03.

[12]St. Rec. Vol. 3 of 4, Appeal Brief, 2007-KA-1431, 11/27/07.

[13]State v. Thompson, 855 So.2d at 442; St. Rec. Vol. 10 of 13, La. 4th Cir. Opinion, 2003-KA-0599, 9/24/03.

[14]State v. Thompson, 867 So.2d 686 (La. 2004); St. Rec. Vol. 11 of 13,  La. S. Ct. Order, 2003-K-2883, 2/13/04; La. S. Ct. Writ Application, 03-K-2883, 10/17/03; St. Rec. Vol. 3 of 13, La. S. Ct. Letter, 2003-K-2883, 10/20/03.

days later, on May 13, 2004, when he did not file a writ application with the United States Supreme Court.  Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

On February 15, 2005, Thompson's counsel filed an application for post-conviction relief raising ineffective assistance of counsel based on five arguments:[15] (1) Counsel failed to file a motion to sever. (2) Counsel failed to object to hearsay testimony. (3) Counsel failed to obtain Thompson's rap sheet before trial. (4) Counsel engaged in cross-examination tactics that back-fired. (5) Counsel failed properly to investigate the case or call Johnny White as a witness.  Thompson filed a pro se supplement to the application adding additional arguments in support of the ineffective assistance of counsel claim:[16] (1) Counsel failed to object to the judge's erroneous statement denying the jury's request to see the cell phone records during deliberation. (2) Counsel was fatigued during trial.

---

[15]St. Rec. Vol. 3 of 13, Application for Post-Conviction Relief, 2/15/05.

[16]St. Rec. Vol. 3 of 13, Supplemental Application for Post-Conviction Relief, 5/3/05.

On November 16, 2007, the state trial court held an evidentiary hearing on the application, after which counsel was allowed to file supplemental briefs.[17]  Thereafter, on May 16, 2008, the state trial court entered its reasons, finding the claims without merit and denying relief.[18]  Both the Louisiana Fourth Circuit and the Louisiana Supreme Court denied counsel's subsequent writ applications without stated reasons.[19]

## II.   FEDERAL HABEAS PETITION

On February 22, 2010, the clerk of this court filed Thompson's petition for federal habeas corpus relief, in which he asserts the following claims:[20] (1) The evidence was insufficient to convict. (2) Counsel gave ineffective assistance, including that counsel failed to (a) investigate and obtain a copy of Thompson's rap sheet before trial, (b) call petitioner's mother as a defense witness, and (c) object to the trial court's erroneous denial of the jury's request to re-examine the cell phone records.[21]

---

[17]St. Rec. Vol. 1 of 13, Hearing Minutes, 11/16/07; St. Rec. Vol. 2 of 13, Post-Conviction Hearing Transcript, 11/6/07; Supplemental Memorandum, 1/7/08; State's Post-Hearing Memorandum, undated.

[18]St. Rec. Vol. 2 of 13, Trial Court Judgment, 5/16/08.

[19]State v. Thompson, 19 So.3d 5 (La. 2009); St. Rec. Vol. 13 of 13, La. S. Ct. Order, 2008 KP-2541, 10/9/09; La. S. Ct. Writ Application-Vol. I, 08-KP-2541, 10/23/08; La. S. Ct. Writ Application-Vol. II, 08-KP-2541, 10/23/08; St. Rec. Vol. 2 of 13, La. S. Ct. Letter, 2008-KP-2541, 10/23/08; St. Rec. Vol. 12 of 13, 4th Cir. Order, 2008-K-0871, 9/23/08; 4th Cir. Writ Application, 2008-K-0871, 7/3/08.

[20]Rec. Doc. No. 3.

[21]Rec. Doc. No. 3-1, pp. 5, 21, 23, 24.

The State filed a response to Thompson's petition arguing that Thompson's claim that counsel was ineffective for failing to call his mother has not been exhausted through the state courts.[22]  The State also argues that the remaining claims and arguments are without merit.[23]

In his traverse to the State's opposition, Thompson concedes that he did not raise the failure to call his mother as a basis for ineffective assistance in the state courts.[24] Consequently, he requests that the argument be withdrawn.  I will recommend that Thompson's request be granted, and I will not address that unexhausted argument.

III.   <u>GENERAL STANDARDS OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[25] and

---

[22]Rec. Doc. No. 15.

[23]The State addresses numerous arguments related to the ineffective assistance of counsel claim which were <u>not</u> raised in Thompson's <u>federal</u> petition.  The claims are designated by the State as follows and purportedly assert that Thompson's counsel failed to "(d) obtain documentation which corroborated that the Thompson family purchased the Nintendo game console; (e) seek a severance, which led to his having to defend the petitioner from attacks by the State and counsel for co-defendant, and move for a mistrial once those attacks had occurred; (f) object to hearsay testimony from several witnesses and to the introduction of the 911 tape; (g) be sufficiently rested during the trial; and (h) call witnesses who would have attacked Anastasia Jones's credibility."  Rec. Doc. No. 15, p. 7. While these claims were raised and found meritless in the state courts, Thompson has <u>not</u> raised these arguments in this court. I will not address arguments discussed by the State that have <u>not</u> been asserted by Thompson in this court.

[24]Rec. Doc. No. 18.

[25]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become

applies to habeas petitions filed after that date.  <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir. 1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Thompson's petition, which, for reasons discussed below, is deemed filed in this federal court on December 21, 2009.[26]

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; <u>i.e.</u>, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  <u>Nobles v. Johnson</u>, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).  In this case, except as discussed above, the State presents no defenses of these kinds.

---

effective at the moment they are signed into law.  <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 (5th Cir. 1992).

[26]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. <u>Coleman v. Johnson</u>, 184 F.3d 398, 401 (5th Cir. 1999), <u>cert.</u> <u>denied</u>, 529 U.S. 1057 (2000); <u>Spotville v. Cain</u>, 149 F.3d 374, 378 (5th Cir. 1998); <u>Cooper v. Brookshire</u>, 70 F.3d 377, 379 (5th Cir. 1995).  Thompson's petition was filed by the clerk of this court on February 22, 2010, when the filing fee was paid after denial of his pauper application.  Thompson's signature on the certificate of service on the memorandum attached to his petition is dated December 21, 2009.  This is the earliest date on which he could have delivered the set of pleadings to prison officials for mailing.  The fact that he later paid the filing fee does not alter the application of the federal mailbox rule to his pro se petition.  <u>See</u> <u>Cousin v. Lensing</u>, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing <u>Spotville</u>, 149 F.3d at 374).

IV.   <u>STANDARDS OF A MERITS REVIEW</u>

Amended 28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  <u>Nobles</u>, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), <u>cert. denied</u>, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir. 2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir.), <u>cert. denied</u>, 531 U.S. 849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry, 532 U.S. at 792-93;

Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone,

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert.

denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25);

Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

V.     INSUFFICIENT EVIDENCE

       Thompson argues that the evidence was insufficient to support the convictions.

He argues that the witnesses to the G.L. armed robbery and kidnapping could not identify

13

him as a perpetrator and G.L.'s identification was delayed.  He also suggests that there was no surveillance evidence to corroborate that G.L. was found at the Texaco station and no questions about his level of intoxication were asked.  He also notes that his fingerprints were not found in the G.L. vehicle.  He further suggests that the fact that Jacobs was found not guilty is a significant factor in considering the sufficiency of the evidence.

These arguments were asserted by counsel on direct appeal in the Louisiana Fourth Circuit and were denied as meritless.  Relying on the well-established standard of Jackson v. Virginia, 443 U.S. 307 (1979), and related state case law, the court considered the evidence, in a light most favorable to the prosecution, and resolved that the evidence was sufficient to support the verdicts.

Under Jackson, the court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt.  Jackson, 443 U.S. at 319; Gilley v. Collins, 968 F.2d 465, 467 (5th Cir. 1992); Guzman v. Lensing, 934 F.2d 80, 82 (5th Cir. 1991).  Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.  Alexander v. McCotter, 775 F.2d 595, 597-98 (5th Cir. 1985); Turner v. McKaskle, 775 F.2d 999, 1001 (5th Cir. 1983).  The court's consideration of the sufficiency of the evidence extends only to what was

14

presented at trial. Guzman, 934 F.2d at 82 (citing Tyler v. Phelps, 643 F.2d 1095, 1102 (5th Cir. 1981)).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses because those determinations are the exclusive province of the jury. United States v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993); see also Jackson, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."). Thus, all credibility choices and conflicting inferences are to be resolved in favor of the verdict. Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005). The reviewing court is not authorized to substitute its interpretation of the evidence for that of the fact-finder. Alexander, 775 F.2d at 598.

A claim of insufficient evidence presents a mixed question of law and fact. Maes v. Thomas, 46 F.3d 979, 988 (10th Cir. 1995). Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Thompson was charged with and found guilty of two counts of armed robbery and one count of second degree kidnapping. Although his arguments are mostly addressed to the armed robbery convictions, I will discuss the sufficiency of the evidence to support the second degree kidnapping conviction as well.

15

In Louisiana, armed robbery is "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. Rev. Stat. Ann. § 14:64.   A dangerous weapon is defined as "any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." La. Rev. Stat. Ann. § 14:2(3).  The "force or intimidation" in an armed robbery "may be applied at any time in the course of the crime in order to complete the offense." State v. Walker, 681 So.2d 1023, 1028 (La. App. 2d Cir. 1996). An armed robbery is committed "not only if the perpetrator uses force or intimidation to take possession of the property, but also if force or intimidation is used to retain possession immediately after the taking, or to carry away the property, or to facilitate escape." State v. Meyers, 620 So.2d 1160, 1163 (La. 1993) (finding that defendant committed a robbery when he used force or intimidation to retain possession of money he had just taken from a cash register).

Under Louisiana law, second degree kidnapping occurs when the victim is imprisoned or kidnapped when the perpetrator is armed with a dangerous weapon.  La. Rev. Stat. Ann. § 14:44.1(A).  A kidnapping, under this rule, occurs when the victim is forcibly seized and carried from one place to another, or the victim is enticed or persuaded to go from one place to another, or the victim is imprisoned or forcibly secreted away. La. Rev. Stat. Ann. § 14:44.1(B).  The Louisiana Supreme Court has held

16

that the term "from one place to another" "requires evidence that the offender relocated the victim from one physical setting or environment to another." State v. Davillier, 752 So.2d 149, 150 (La. 1999).

With regard to the Jones robbery, Thompson argues that none of Jones's jewelry or other belongings were found in his possession or at his apartment. He also suggests that the State never established that the Nintendo 64 seized from his apartment belonged to Jones. He further claims that the State failed to produce Johnny White as a witness to corroborate Jones's testimony.

With regard to the G.L. armed robbery and second degree kidnapping, Thompson argues that the identification evidence was insufficient. He argues that G.L. delayed his identification and none of the other witnesses could identify him in the photographic lineups. He also argues that there was no physical evidence to link him to the crime; specifically, no fingerprints in the car and no stolen items recovered from his apartment.

Contrary to Thompson's arguments regarding what the record does not contain, the record in fact contains substantial evidence from which the jury could reasonably find that Thompson committed both armed robberies and the second degree kidnapping.

The trial evidence and testimony established that on the day after the robbery, January 26, 2002, Jones informed police that she allowed Thompson into her apartment

because he asked to speak with her.[27]  Before talking with her, he went to the bathroom and immediately returned with a drawn pistol.  He called for an accomplice, "Yo C" to come into the apartment from the hallway.[28]  Thompson forced Jones into the bedroom where her boyfriend and infant child were sitting on the bed.  After forcing her boyfriend to remove all of his clothing, Thompson forced them into the kitchen, then moved them to the bathroom and into a closet.[29]  Thompson threatened Jones if she reported the incident.[30]  She later determined that certain items were missing from her apartment, including a radio, jewelry, her state ID card and a Nintendo 64 game system.[31]

Jones identified Thompson by name and later identified his photograph for police.[32]  Police officers recovered several items from Thompson's apartment, including a state ID card issued in the name of Anastasia Jones.[33]  The officers also seized, among

---

[27]St. Rec. Vol. 8 of 13, Trial Transcript, pp. 156-157, 6/18/02 (Officer Gary Calico); Trial Transcript, p. 165, 6/18/02 (Anastasia Jones).

[28]Id., p. 156 (Officer Gary Calico); St. Rec. Vol. 8 of 13, Trial Transcript, p. 167, 6/18/02 (Anastasia Jones).

[29]St. Rec. Vol. 8 of 13, Trial Transcript, pp. 167-168, 188, 6/18/02 (Anastasia Jones).

[30]Id., pp. 167-168, 176-177 (Anastasia Jones).

[31]Id., pp. 156-157 (Officer Gary Calico); St. Rec. Vol. 8 of 13, Trial Transcript, p. 168, 6/18/02 (Anastasia Jones).

[32]St. Rec. Vol. 4 of 13, Trial Transcript, pp. 52-53, 6/17/02 (Sergeant Jerome Laviolette); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 16, 21, 30, 6/18/02 (Detective John Duzac); Trial Transcript, p. 172, 6/18/02 (Anastasia Jones).

[33]St. Rec. Vol. 4 of 13, Trial Transcript, pp. 51, 52, 6/17/02 (Sergeant Jerome Laviolette); St. Rec. Vol. 8 of 13, Trial Transcript, p. 34, 6/18/02 (Detective John Duzac); Trial Transcript, p. 124, 6/18/02 (Detective Anthony Pardo).

other things, a small caliber handgun, a "Nintendo Play Station,"[34] a black skull cap, a

yellow shirt and jeans, all items identified as being worn by the two men at Jones's

apartment or taken from the apartment.[35]

The evidence and testimony also showed that G.L., K.G. and D.D. watched the

Krewe of Cleopatra Mardi Gras parade on January 25, 2002.[36]  When returning to their

car in a lot next to a Winn Dixie, they were approached from behind by two men, later

identified by the victims as Thompson and Jacobs.[37]  G.L. walked around to the driver's

side and sat in the car, and one of the two men followed him and pulled out a gun.[38]  He

told G.L. to move over in the car.[39]  This perpetrator was a black male, wearing black

clothing, black shirt, black pants and black gloves.[40]  He also wore a black wool skull cap

---

[34]As noted by the state trial court on post-conviction review, there was testimony that the item seized was a Nintendo 64, a Play Station made by Sony, and a "Nintendo Play Station."  St. Rec. Vol. 2 of 13, Trial Court Judgment, p. 3 n.1, 5/16/08.  The item was apparently destroyed by the floodwaters following Hurricane Katrina in 2005.  Id.

[35]St. Rec. Vol. 4 of 13, Trial Transcript, pp. 62, 67, 6/17/02 (Sergeant Jerome Laviolette); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 34, 35, 36, 37, 6/18/02 (Detective John Duzac); Trial Transcript, p. 124, 6/18/02 (Detective Anthony Pardo).

[36]St. Rec. Vol. 8 of 13, Trial Transcript, p. 207, 6/18/02 (D.D.); Trial Transcript, pp. 227-228, 6/18/02 (K.G.); Trial Transcript, p. 268, 6/18/02 (G.L.).

[37]Id., p. 207 (D.D.); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 227-228, 6/18/02 (K.G.); Trial Transcript, p. 270-71, 6/18/02 (G.L.).

[38]Id., p. 210 (D.D.); St. Rec. Vol. 8 of 13, Trial Transcript, p. 228, 6/18/02 (K.G.).

[39]St. Rec. Vol. 8 of 13, Trial Transcript, p. 228, 6/18/02 (K.G.).

[40]St. Rec. Vol. 8 of 13, Trial Transcript, p. 16, 6/18/02 (Detective John Duzac); Trial Transcript, pp. 145-146, 6/18/02 (Officer Tyrone Robinson); Trial Transcript, p. 287, 6/18/02 (G.L.).

and a white sweatband with "RIP Dogg" on it.[41]   D.D. took off running and went back

to their other friends at the parade route to get help.[42]   They called G.L.'s cell phone but

did not reach him.

The second perpetrator waived a gun at K.G. and told her to get into the car.[43]  She

instead ran to the Winn Dixie to call 911.[44]   Each of the girls gave statements to police

at the Winn Dixie.[45]   Because the girls ran off so quickly, neither was able to identify a

photograph of the perpetrator who drove off with G.L., except by clothing.[46]   K.G. later

identified Jacobs from a photographic lineup.[47]

Thompson drove off with G.L., who was then seated in the front passenger seat,

and Thompson kept the gun pointed at G.L.'s head.[48]   Thompson asked G.L. for his

wallet, his cell phone and any drugs.[49]   G.L. told Thompson that he did not have drugs.

---

[41]Id., p. 15 (Detective John Duzac); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 227-228, 6/18/02 (K.G.); Trial Transcript, p. 277, 6/18/02 (G.L.).

[42]St. Rec. Vol. 8 of 13, Trial Transcript, p. 211, 6/18/02 (D.D.).

[43]St. Rec. Vol. 8 of 13, Trial Transcript, p. 229, 6/18/02 (K.G.).

[44]St. Rec. Vol. 8 of 13, Trial Transcript, pp. 211-12, 6/18/02 (D.D.); Trial Transcript, pp. 228, 229-230, 6/18/02 (K.G.).

[45]St. Rec. Vol. 8 of 13, Trial Transcript, p. 146, 6/18/02 (Officer Tyrone Robinson); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 231, 6/18/02 (K.G.).

[46]St. Rec. Vol. 8 of 13, Trial Transcript, p. 214, 6/18/02 (D.D.); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 231-33, 6/18/02 (K.G.).

[47]St. Rec. Vol. 8 of 13, Trial Transcript, pp. 232-34, 6/18/02 (K.G.).

[48]St. Rec. Vol. 8 of 13, Trial Transcript, p. 271-72, 6/18/02 (G.L.).

[49]Id., p. 273 (G.L.).

At first, G.L. also thought that he did not have his cell phone, until it rang.[50]  Thompson took the cell phone from G.L. and threw it on the driver's side floor.[51]  Thompson continued to drive around and eventually told G.L. to take off his clothes.[52]  G.L. complied and put the clothes on the floor at his feet.  After driving on, Thompson then had G.L. put his arm over his head.[53]  Thompson put the gun up to G.L.'s side and said "I hate to do this."  At that moment, the car hit a curb, and a tire blew out.

Thompson continued to drive on the flat tire until he pulled up to an air pump in the back corner of a Texaco station on General DeGaulle at Sandra.  Thompson got out of the car and then told G.L. to get out of the car.[54]

As G.L. exited the car, Officer Jeffery Reyes, who was on the lookout for the stolen white Honda, happened upon the parked car and the naked G.L. at the Texaco station.[55]  As the officer got out, Thompson walked to the back of the car and started to walk away.[56]  After Officer Reyes inquired as to what was going on, Thompson took off

---

[50]Id., p. 274 (G.L.).

[51]Id., pp. 274-275 (G.L.).

[52]Id., pp. 275-76 (G.L.).

[53]Id., p. 277 (G.L.).

[54]Id., p. 278 (G.L.).

[55]Id., p. 278 (G.L.); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 131-132, 6/18/02 (Officer Jeffery Reyes).

[56]Id., p. 278 (G.L.).

running.[57]  Reyes took chase but he was unable to stop Thompson, who ran towards the

Woodland Apartments.[58]  Detective John Duzac and Officer Tyrone Robinson later

interviewed G.L. at the Texaco station.[59]

Sergeant Jerome Laviolette located G.L.'s clothing near the Woodlands

Apartments where Thompson dropped them.[60]  The next day, G.L. identified Thompson

in less than a minute from a photographic line-up.[61]  Officer Reyes also identified

Thompson from the photographic line-up.[62]

The detectives later recovered from Thompson's apartment, among other things,

a small caliber handgun, a box of latex gloves and a white headband with "RIP DOGG"

on it, an item worn by Thompson during the G.L. robbery and identified by the

witnesses.[63]  Because Thompson took G.L.'s cell phone, the detectives obtained the cell

---

[57]St. Rec. Vol. 8 of 13, Trial Transcript, p. 132, 6/18/02 (Officer Jeffery Reyes); Trial Transcript, p. 278 (G.L.).

[58]Id., pp. 132-136 (Officer Jeffery Reyes).

[59]St. Rec. Vol. 8 of 13, Trial Transcript, p. 16, 6/18/02 (Detective John Duzac); Trial Transcript, p. 145, 6/18/02 (Officer Tyrone Robinson).

[60]St. Rec. Vol. 4 of 13, Trial Transcript, pp. 43-45, 80, 6/17/02 (Sergeant Jerome Laviolette).

[61]Id., pp. 45-46, 69 (Sergeant Jerome Laviolette); St. Rec. Vol. 8 of 13, Trial Transcript, p. 24, 6/18/02 (Detective John Duzac); Trial Transcript, pp. 280-81, 6/18/02 (G.L.).

[62]St. Rec. Vol. 8 of 13, Trial Transcript, pp. 30-31, 6/18/02 (Detective John Duzac); Trial Transcript, p. 136, 6/18/02 (Officer Jeffery Reyes).

[63]Id., p. 51, 67 (Sergeant Jerome Laviolette); Trial Transcript, p. 124, 6/18/02 (Detective Anthony Pardo).

phone records.[64]  They ascertained that seven calls were made after the robbery and all of the people called were interviewed.[65]  One of the numbers belonged to Thompson's father.[66]  One number belonged to Tamika Byrd, who was the co-defendant Jacobs's girlfriend.[67]

Viewed in the light most favorable to the prosecution, this evidence established that multiple witnesses and victims identified Thompson as the perpetrator in both armed robberies and the second degree kidnapping.  Contrary to Thompson's suggestions, G.L. identified his picture to officers without hesitation.  The police officer who chased him from G.L.'s car also identified him from the photographic line-up.  Jones identified him by name and by his picture.

The evidence also established that police recovered several items belonging to Jones at Thompson's apartment, including her ID card.  Police were present when Thompson discarded G.L.'s clothing near the apartment complex.  They also traced

---

[64]Id., p. 54 (Sergeant Jerome Laviolette); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 39-40, 6/18/02 (Detective John Duzac).

[65]Id., p. 54 (Sergeant Jerome Laviolette); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 39-40, 6/18/02 (Detective John Duzac).

[66]Id., p. 54 (Sergeant Jerome Laviolette); St. Rec. Vol. 8 of 13, Trial Transcript, p. 40, 6/18/02 (Detective John Duzac).

[67]Id., pp. 56-58 (Sergeant Jerome Laviolette); St. Rec. Vol. 8 of 13, Trial Transcript, pp. 41-42, 6/18/02 (Detective John Duzac).

telephone calls made from G.L.'s cell phone to Thompson's father and to Jacobs's girlfriend. These facts were sufficient to link Thompson to the three crimes.

The jury clearly did not believe Thompson's alibi defense and resolved that he committed each crime. That credibility determination was within the jury's province. Jackson, 443 U.S. at 319; Ramirez, 398 F.3d at 695 (resolution of credibility and conflicting inferences are resolved in favor of the verdict). Thus, the credible evidence demonstrated that Thompson, armed with a weapon, robbed Jones of certain valuables, including a video game system, a radio, her state ID card, and other valuables. Thompson, in an effort to retain these items, also threatened Jones if she reported the incident. This was sufficient to establish the armed robbery of Jones.

The evidence also established that Thompson, armed with a weapon, took from G.L. his wallet, cell phone and clothing. Thompson forced G.L. at gunpoint into the passenger seat of G.L.'s car, transported G.L. around the Westbank from the Winn Dixie to the Texaco station, against G.L.'s will and at gunpoint. This was sufficient to establish the armed robbery and the second degree kidnapping of G.L.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent. Thompson is not entitled to relief on this claim.

VI.   <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Thompson alleges that his trial counsel gave ineffective assistance by failing to (1) investigate and obtain a copy of Thompson's rap sheet before trial, (2) call petitioner's mother as a defense witness, and (3) object to the trial court's erroneous denial of the jury's request to re-examine the cell phone records.  As discussed above, Thompson concedes that the second factor of this claim, calling his mother as a witness, was not exhausted in the state courts and he requests that this claim be dismissed, so that he may proceed with the two exhausted claims.[68]

Thompson alleged ineffective assistance of counsel in his application for post-conviction review.  After receiving testimony at the evidentiary hearing, the state trial court denied relief, relying on the standards set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  The court found that Thompson failed to establish any prejudice arising from his counsel's failure to obtain the rap sheet prior to trial.  The court also held that the state trial court was not required to give copies of the telephone records to the jury, and even if it should have, Thompson showed no prejudice arising from counsel's failure

---

[68]Thompson also generally references the general arguments raised in his state pleadings that counsel should have sought a severance of the trials, should have objected to the hearsay testimony of the police, should have objected to the 911 tape, which he concedes was admissible, and should have investigated the registration of the game system seized from Thompson's apartment. He does not, however, include these in his listing of grounds to be addressed by this court.

to object to the state trial court's ruling.  This was the last reasoned decision on the issue. Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

The issue of ineffective assistance of counsel is a mixed question of law and fact. Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994).  Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The standard for judging performance of counsel was established by the United States Supreme Court in  Strickland, 466 U.S. at 668, which was relief on by the state trial court.  In Strickland, the United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and resulting prejudice.  Strickland, 466 U.S. at 697.  The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  Kimler, 167 F.3d at 893.  A habeas corpus petitioner "need not show that 'counsel's deficient conduct

more likely than not altered the outcome in the case.'  It is not enough under <u>Strickland</u>, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'"  <u>Motley</u>, 18 F.3d at 1226 (quoting <u>Strickland</u>, 466 U.S. at 693).

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance."  <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 689-90).  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial.  <u>Strickland</u>, 466 U.S. at 689; <u>Neal v. Puckett</u>, 286 F.3d at 236-37; <u>Clark v. Johnson</u>, 227 F.3d 273, 282-83 (5th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1167 (2001).  "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." <u>Bell</u>, 535 U.S. at 697 (citing <u>Strickland</u>, 466 U.S. at 689).

This court must apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 690.  Federal courts have consistently recognized that tactical

decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance.  Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.  Strickland, 466 U.S. at 689; Moore, 194 F.3d at 591.  The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient.  Id.

During direct testimony, Anastasia Jones indicated that she almost did not answer the door when Thompson knocked on it on the evening of January 25, 2002.  She exclaimed "Oh, man" and answered it anyway because she "had nothing to hide."[69] During cross-examination by Thompson's counsel, Jones was asked to explain what she meant by "nothing to hide."[70]  She answered that, the night before, Thompson showed up at her apartment and opened her door, because she left it open for company to come into her apartment.  She did not report this to police.

Fuller also asked why she said "Oh, man" when she noticed him at the door on the night of the robbery.  She stated that on January 22, 2002, three nights before the robbery, Thompson showed up at her apartment while he was drunk.  She asked him to leave and he would not.  She said "Oh, man" because she did not want to be bothered

---

[69]St. Rec. Vol. 8 of 13, Trial Transcript, pp. 165, 6/18/02 (Anastasia Jones).

[70]Id., p. 175.

with him again.[71]  When asked if she told the police about this, she answered affirmatively.

Counsel then asked if Jones would be surprised to learn that this was not in any police reports.  Jones informed counsel that it should be, because the police were called to her apartment on January 22 and Thompson was arrested.  Jones reiterated this on re-direct by the prosecutor.[72]

Between the end of defense counsel's questioning and the State's redirect, the state trial court heard argument of counsel regarding the testimony on this municipal arrest and conviction.[73]  Defense counsel advised the court that he had not been provided with the municipal affidavit.[74]  He also argued that he specifically asked for his client's rap sheet and it was not provided by the State.[75]  He also noted that the police report he was provided did not have a rap sheet attached.[76]

---

[71]Id., p. 176.

[72]Id., p. 202.

[73]Id., pp. 194-195.

[74]Id., p. 195.

[75]Id., pp. 197-198.

[76]Id., p. 199.

The prosecutor responded that counsel had not asked for municipal records and it was not anticipated that the defense would open the door to that incident.[77]  The prosecutor advised the court that he responded to all of defendant's discovery requests and that he did not receive any objections or indication that the answers were not complete.[78]

The state trial court told defense counsel that it was his responsibility to obtain the copy if he did not receive one at the arraignment or through discovery as requested.[79] Over counsel's objections, the state trial court allowed the State to admit the municipal affidavit and question Jones about the arrest.[80]

The issue of whether the admission of this affidavit was error by the state trial court was raised on direct appeal.  The Louisiana Fourth Circuit held that, pursuant to La. Code Crim. P. art. 729.5, the trial court did not abuse its discretion in allowing the affidavit to be admitted, because defense counsel had not notified the court that he had not been provided with the rap sheet.[81]  The appellate court also resolved that the

---

[77]Id., p. 197.

[78]Id., p. 198.

[79]Id., pp. 200-01.

[80]Id., p. 201.

[81]St. Rec. Vol. 10 of 13, La. 4th Cir. Opinion, 2003-KA-0599, p. 15, 9/24/03.

affidavit was admissible in light of the fact that the defense opened the door to introduction of the affidavit.[82]

When counsel's role in this was reviewed in post-conviction proceedings, counsel testified that he did not know about that municipal charge, because the State failed to provide him with the rap sheet.[83]   Counsel conceded that he could have obtained the report or complained to the trial court about not receiving it before trial.[84]   Counsel believed that the affidavit impacted the jury's view of his client and that he may have altered his questions had he known about this municipal conviction.[85]   He further stated, however, that the disclosure of this municipal conviction did not effect his decision to allow Thompson to testify.[86]   That was a decision he had been discussing with Thompson and that he had always considered.   He also conceded, however, that the revelation of the conviction did not change the defense he presented.

As the state trial court determined, Thompson has not established that counsel's failure to obtain the rap sheet before trial was prejudicial.   Counsel testified that he had planned to put Thompson on the stand as part of the alibi defense before the municipal

---

[82]Id., p. 16.

[83]St. Rec. Vol. 2 of 13, Post-Conviction Hearing Transcript, pp. 12-13, 11/16/07.

[84]Id., p. 13.

[85]Id., pp. 13-14.

[86]Id., p. 23.

conviction was revealed by his questioning of Jones.  This and Thompson's other drug convictions would have been and were in fact addressed at trial anyway when he testified.

Thompson's alibi defense was not affected by the revelation of the conviction. The alibi defense presented a credibility contest.  As discussed above, the jury clearly did not believe the alibi defense, and it was well within the province of the jury to reject it. The fact that counsel's defense strategy was not successful does not render his performance unconstitutionally deficient.  See Martinez v. Dretke, 99 Fed. Appx. 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689 (citations omitted).  In light of the overwhelming evidence of guilt and the jury's rejection of the alibi evidence, Thompson has not shown that counsel's failure to obtain the rap sheet had any impact on the verdict.

The law does not assess counsel's performance based on hindsight, but instead judges his performance and its effects as of the time of trial.  Bell, 535 U.S. at 697 (citing Strickland, 466 U.S. at 689).  When asked by post-conviction counsel to assess his performance based on the outcome of the trial, defense counsel testified five years after

the fact that he would have done several things differently.[87]  That, however, is not the standard for testing his performance in 2002.  For all of the foregoing reasons, the state courts' denial of relief was not contrary to or an unreasonable application of <u>Strickland</u>. Thompson is not entitled to relief on this claim.

Thompson next argues that counsel rendered ineffective assistance when he failed to object to the state trial court's decision not to allow the jury to review the cell phone records during deliberations.  The record reflects that, during deliberations, the trial court stated:

> BY THE COURT:
> Let the record reflect that at 3:55 p.m. the jurors requested in writing to see some telephone records.  At this time I'm going to deny because they are not entitled to have documents sent in to the jury room.

State Record Volume 10 of 13, Trial Transcript, page 87, June 20, 2002.  Thompson argues that this ruling was contrary to Louisiana law which would allow the jury to view documents when necessary for them to reach a verdict, and his counsel erred in failing to object to the improper ruling.

In addressing Thompson's post-conviction claims, the state trial court intimated that Thompson's version of Louisiana law was incorrect.  The court determined that the jury's purpose in asking to review the telephone records must have been to examine the verbal content and not just to confirm the existence of the records.  The court confirmed

---

[87]<u>Id</u>., p. 18-20.

33

that the jury was not entitled to use the documents in that way under Louisiana law.  In

addition, the court noted that Thompson had shown no prejudice from the trial court's

decision.

The use of documentary evidence by a jury during deliberations is governed by

La. Code Crim. P. art. 793, which provides as follows:

> A.   Except as provided in Paragraph B of this Article, a juror must rely
> upon his memory in reaching a verdict.  He shall not be permitted to
> refer to notes or to have access to any written evidence.  Testimony
> shall not be repeated to the jury.  Upon the request of a juror and in
> the discretion of the court, the jury may take with it or have sent to
> it any object or document received in evidence when a physical
> examination thereof is required to enable the jury to arrive at a
> verdict.
>
> B.   A juror shall be permitted to take notes when agreement to granting
> such permission has been made between the defendant and the state
> in open court but not within the presence of the jury.  The court shall
> provide the needed writing implements.  Jurors may, but need not,
> take notes and such notes may be used during the jury's deliberations
> but shall not be preserved for review on appeal.  The trial judge shall
> ensure the confidentiality of the notes during the course of trial and
> the jury's deliberation and shall cause the notes to be destroyed
> immediately upon return of the verdict.
>
> C.   The lack of consent by either the defendant or the state to allow a
> juror to take notes during a trial shall not be communicated to the
> jury.

As alluded to by the state trial court, the Louisiana Supreme Court has established

that, pursuant to La. Code Crim. P. art. 793, the jury is not to inspect written evidence,

except for the sole purpose of a physical examination of the document itself to determine

an issue that <u>does</u> <u>not</u> require examination of the verbal contents of the document.  <u>State</u>

34

v. Perkins, 423 So.2d 1103, 1109-1110 (La. 1982). Louisiana courts have consistently held that, under La. Code Crim. P. art. 793, "the jury is not to inspect written evidence except for the sole purpose of a physical examination of the document itself to determine an issue which does not require the examination of the verbal contents of the document. For example, a jury can examine a written statement to ascertain or compare the signature, or to see or feel it with regard to its actual existence." State v. Caston, 914 So.2d 122, 131 (La. App. 2d Cir. 2005) (citing State v. Freetime, 303 So.2d 487, 489 (La. 1974)).

In Thompson's case, one set of telephone records was introduced as evidence by the State to establish that there were seven calls made from G.L.'s phone after it was stolen by Thompson. The detectives called each number and determined that one of the numbers was Thompson's father's and another was Jacobs's girlfriend's. The trial record also indicates that another set of telephone records from the prison were submitted to confirm that Thompson called his father at that same number while he was in jail after his arrest for these crimes. The record does not reveal any basis for the jury to have doubted the existence of these records to necessitate that they be viewed during deliberations. Instead, based on the record, it was reasonable for the state courts to address the request as a sign that the jury intended to review the verbal content of the records. That use is not permitted by Louisiana law.

Because the state trial court's decision to deny the jury's request was within the law, there would have been no basis for Thompson's counsel to object. Counsel's failure to make a frivolous or legally baseless objection is not deficient performance falling below an objective level of reasonableness. Green v. Johnson, 160 F.3d 1029, 1037 (5th Cir. 1998).

For these reasons, the state courts' denial of relief was not contrary to, or an unreasonable application of Strickland. Thompson is not entitled to relief on this claim.

### RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that Jason Thompson's request to dismiss the unexhausted claim of ineffective assistance of counsel based on counsel's failure to call his mother as a witness at trial be **GRANTED** and the claim be **DISMISSED** for failure to exhaust.

It is further **RECOMMENDED** that the petition of Jason Thompson for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served

with notice that such consequences will result from a failure to object.  <u>Douglass v.</u>

<u>United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[88]

New Orleans, Louisiana, this _____14th_____ day of October, 2010.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[88]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.